Filed 2/13/25  P. v. Styre CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ROBERT EUGENE STYRE, JR.<br><br>    Defendant and Appellant. | H051174<br>(Santa Clara County<br>Super. Ct. No. C1916968) |

A jury rejected defendant's self-defense argument and convicted him of the second degree murder of Bridger Fleming.  Defendant testified he shot Fleming after Fleming threatened him and then reached into a backpack.  Although defendant never saw a gun, he maintained he thought Fleming was pulling out a revolver because defendant's girlfriend—who was in a relationship with both men—warned him that Fleming had recently acquired a gun.  The woman denied giving such a warning and the victim was not found to have had a gun at the scene.

On appeal, defendant asserts the trial court improperly excluded evidence that the girlfriend had seen a revolver-shaped BB gun at Fleming's campsite about nine months before the shooting.  He argues the evidence was relevant to his self-defense theory because it would have corroborated his claim that the girlfriend had warned him about a revolver.  Defendant also contends the trial court improperly declined to instruct the jury on heat of passion voluntary manslaughter, and that the cumulative effect of these two errors requires reversal.  Because we find no error in either ruling, we will affirm.

# I.   BACKGROUND

## A.   TRIAL EVIDENCE

### 1.   The Shooting

Defendant shot Bridger Fleming in a San Jose grocery store parking lot in September 2019.  At the time of the shooting, defendant and Fleming were both in an open relationship with a woman named Salina.  Defendant started seeing her about six weeks before the shooting and knew Fleming through her.  Each man was aware she was seeing them both.

All three were living unhoused.  Defendant lived in his car.  Fleming lived in a campsite near the parking lot where he was shot.  Salina sometimes slept at Fleming's campsite and sometimes in defendant's car.  She testified that during that time she was regularly using drugs—including crystal meth, marijuana, alcohol and cocaine—with both Fleming and defendant.

Defendant testified that about two weeks before the shooting, he got into a fight with Fleming (who was much smaller than defendant) in which he punched Fleming and knocked him to the ground because Fleming was being disrespectful.  Defendant testified that after the fight, Salina told him Fleming had acquired a small revolver.  A few days before the shooting, defendant illegally obtained a .22 caliber bolt-action rifle and kept it in the backseat of his car hidden under a towel.

Salina slept in defendant's car the night before the shooting.  Defendant dropped her off near the grocery store parking lot and Fleming's campsite the next morning.  Defendant made plans with her to go to the beach later that day.

Salina testified she planned to eat lunch with Fleming, accompany him to cash his paycheck and then buy more drugs and alcohol; she did not recall telling defendant about the plan.  While waiting for Fleming, she drank alcohol, smoked marijuana and talked with a friend named Derrick, who was sitting in his truck next to a grassy area near the

2

grocery store.  When Fleming arrived, they ate lunch together on a blanket borrowed from Derrick.

Defendant returned to the grocery store at around noon and was annoyed when Salina told him she was going with Fleming to his workplace.  Defendant testified that when he offered them a ride, Fleming declined and responded with words to the effect that defendant wouldn't want to be alone in the car with Fleming because Fleming would kill him.  Defendant took Fleming's threat seriously because he believed Fleming now had a gun.  Fleming stood up and reached into his backpack.  Defendant was still sitting in the driver's seat of his car, with his windows down and doors shut.  He didn't drive away because he didn't want to turn his back to Fleming.

Defendant acknowledged he did not see a gun in Fleming's hand, but rather an "object" that he could not describe but feared was the revolver.  Defendant got out of his car, grabbed his rifle (which was already loaded) and shot Fleming once in the chest.  Defendant maintained he was scared and fired in self-defense because Fleming had just threatened him and he believed Fleming was reaching into his backpack for the revolver to shoot him.

Defendant threw the rifle into his car and sped off.  He disposed of the rifle in a creek and drove to another girlfriend's home in Ceres, where police arrested him the next day.

Paramedics transported Fleming to a hospital where he was declared dead around 1:00 p.m.  A mother and her adult daughter who were in the parking lot when the shooting occurred saw Fleming stagger and collapse, but neither saw him holding any object near his body.  Police searched the area and did not recover a gun.  According to testimony from witnesses, surveillance footage from the store at various points shows Fleming with a backpack and skateboard, the movement of some of the vehicles involved, a person (identified as Salina) riding away on a bicycle after defendant shot

3

Fleming, and a person (apparently Derrick) walking from a vehicle toward Fleming's body, bending down, returning to the vehicle and leaving the scene.

In his interview with police, defendant initially denied any involvement, but ultimately admitted shooting Fleming after detectives told him they had the grocery store's surveillance video. Defendant stated he had been warned about Fleming having a gun and that he just reacted after Fleming threatened him and reached into the backpack.

Defendant was charged with murder (Pen. Code, § 187, subd. (a); count 1), including the allegation he personally discharged a firearm resulting in great bodily injury or death (§ 12022.53, subd. (d)); being a felon in possession of a firearm (§ 29800, subd. (a)(1); count 2); and allegations of two prior strike convictions (§§ 667.5, subd. (c); 1170.12, subd. (b)(1)) and a prior serious felony conviction (§ 667, subd. (a)).

### 2. Salina's Statements to Police

Salina was arrested a few weeks after the shooting on an unrelated misdemeanor warrant and was interviewed about the shooting. (According to the detective who interviewed her, Salina admitted using various drugs, but did not appear to be under the influence during the interview.) She initially denied any knowledge of the events. When detectives informed her of the surveillance video, she admitted being present with defendant, Fleming and their friend Derrick. She told detectives she saw defendant holding a rifle, heard the gunshot and saw defendant shoot Fleming.

Detectives questioned her about defendant's claim that she told him Fleming had obtained a gun. She denied Fleming had acquired or attempted to acquire a gun and denied warning defendant about a gun. She had seen a BB gun "last year" in a crate at Fleming's former campsite, which he kept because there were "animals down there." She described it as a black "[s]mall BB gun [¶] … [¶] [l]ike a water gun, maybe" one could buy at a sporting goods store and that resembled a revolver. She told detectives Fleming did not carry it in his backpack or on his person. She denied ever mentioning the BB gun to defendant.

4

### 3. Salina's Trial Testimony

Salina testified she did not know defendant had been in a fight with Fleming, and she denied warning defendant Fleming had obtained a gun. She testified that on the day of the shooting, defendant pulled up in his car while she and Fleming were finishing lunch. She told defendant she intended to go with Fleming to his workplace. Fleming was going to ride his skateboard and she was going to ride a bicycle Fleming had borrowed for her. Defendant offered them a ride, which they declined. Defendant then drove off.

She did not remember many details of the shooting but recalled that as she and Fleming were cleaning up and getting ready to leave, defendant returned in his car. Fleming was talking to Derrick, who was still sitting in his truck, while Salina gathered their trash and was getting ready to leave on the bicycle. She didn't remember hearing a gunshot, but she did recall seeing defendant get out of his car and talk to Derrick. She did not recall hearing defendant and Fleming exchange any words or seeing anything in Flemming's hands before seeing blood coming from his chest. She immediately rode away on the bicycle because she was scared.

At trial, she did not recall most of her police interview. She testified she had been high on crystal meth, marijuana, alcohol and cocaine during the interview. Despite reviewing transcript and video excerpts from the interview, she testified she didn't remember telling detectives she saw defendant shoot Fleming, and she testified she didn't see the shooting.

### B. INSTRUCTIONS, VERDICT AND SENTENCE

The jury was instructed on first and second degree murder with malice aforethought, intentional discharge of a firearm during a crime causing death, justifiable homicide (lawful self-defense), and voluntary manslaughter based on imperfect self-defense. Defendant had requested a voluntary manslaughter instruction based on sudden quarrel or heat of passion, but the trial court ruled that even crediting defendant's

testimony, Fleming's conditional threat and act of standing up and reaching into his backpack was insufficient evidence of provocation to warrant the instruction.

The jury found defendant guilty of second degree murder (Pen. Code, § 187) and unlawful firearm possession (Pen. Code, § 29800, subd. (a)(1)), and found true the firearm special allegation (Pen. Code, § 12022.53, subd. (d)). Defendant admitted the two prior strike convictions from 2013, and the court exercised its discretion to strike one of them. The trial court sentenced defendant to an aggregate term of 55 years to life, consisting of 30 years to life for second degree murder (15 years to life doubled due to the prior strike) with a 25 years to life enhancement for personally discharging a firearm (Pen. Code, §12022.53, subd. (d)). The court imposed a concurrent term of four years (double the middle term) on the firearm possession count, and struck the punishment for the prior serious felony conviction.

## II.    DISCUSSION

### A. NO ABUSE OF DISCRETION IN EXCLUDING THE BB GUN EVIDENCE

Defendant challenges the trial court's exclusion of evidence that Fleming had owned a revolver-shaped BB gun, asserting it was relevant to his self-defense claim. Specifically, defendant argues that the evidence would tend to establish his belief that Fleming had a revolver, and it would have corroborated his testimony that he had been warned by Salina about the gun.

#### 1. Additional Background

After defendant testified that Salina told him Fleming had acquired a revolver after the two men fought, Defense counsel then sought to introduce her statements to police about Fleming's BB gun. The trial court identified two distinct evidentiary issues: (1) whether Salina had told defendant that Fleming acquired a revolver a few days before the shooting; and (2) whether some months before the shooting Fleming had possessed a revolver-shaped BB gun which was not found in his backpack or observed by anyone on the day of the shooting.

6

Defense counsel argued the existence of the BB gun was circumstantial evidence that Salina had warned defendant about a gun, and that Fleming may indeed have had the BB gun but it was removed from the scene. Counsel also argued that whether Fleming owned a BB gun was relevant to defendant's actual fear of Fleming and whether Fleming had the present capacity to inflict harm; counsel intended to argue Derrick had removed objects at the scene—including perhaps a gun—based on the fact that Fleming's skateboard and the blanket Fleming and Hernandez were sitting on were later found in his truck.

The trial court concluded the BB gun evidence was irrelevant because defendant had not testified he knew about the BB gun, and any slight probative value of the evidence was outweighed by potential confusion. The court observed that a BB gun is different from an actual revolver and Salina had distinguished between the two in her police interview. The court also rejected the idea that evidence of the BB gun would corroborate defendant's account because no BB gun was found at the scene.

### 2. Analysis

"Relevant evidence" is evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action," including the credibility of a witness. (Evid. Code, § 210.) Evidence is relevant if it tends logically, naturally or by reasonable inference to establish or negate a material fact. (*People v. Cowan* (2010) 50 Cal.4th 401, 482; *People v. Kronemyer* (1987) 189 Cal.App.3d 314, 347.) "Relevant evidence includes circumstantial evidence that tends to establish a fact from which the existence or nonexistence of the fact in issue can be inferred." (*Phillips v. Honeywell Internat. Inc.* (2017) 9 Cal.App.5th 1061, 1078.) (Italics omitted.) But evidence is irrelevant if it leads only to speculative inferences. (*People v. Morrison* (2004) 34 Cal.4th 698, 711.) A reasonable inference may not be based solely on suspicion, imagination, speculation, supposition, surmise, conjecture, or guess work. (*People v. Raley* (1992) 2 Cal.4th 870, 891, superseded by statute on other

7

grounds as stated in *People v. Brooks* (2017) 3 Cal.5th 1, 63, fn. 8; *People v. Wright* (2016) 4 Cal.App.5th 537, 546.)

The trial court has broad discretion in determining whether evidence is relevant or too speculative to be relevant. (*People v. Gonzales* (2012) 54 Cal.4th 1234, 1260; *People v. Babbitt* (1988) 45 Cal.3d 660, 681 (*Babbitt*).) " 'Speculative inferences that are derived from evidence cannot be deemed to be relevant to establish the speculatively inferred fact in light of Evidence Code section 210, which requires that evidence offered to prove or disprove a disputed fact must have a tendency in reason for such purpose.' " (*Babbitt*, at p. 681.) " 'If proffered evidence can cause the trier of fact only to speculate from such evidence as to the existence or nonexistence of a disputed fact, such evidence is irrelevant and inadmissible, since it does not come within the definition of "relevant evidence" set forth in [Evid. Code,] § 210].' " (*People v. Louie* (1984) 158 Cal.App.3d Supp. 28, 47 (*Louie*) (italics omitted); see *People v. Williams* (2018) 23 Cal.App.5th 396, 416 (*Williams*) [speculative inferences from evidence are not relevant to establish the speculatively inferred fact].) As a result, excluding evidence that leads only to speculative inferences is not an abuse of discretion. (*People v. Peoples* (2016) 62 Cal.4th 718, 743.)

The disputed material fact at issue here is whether Salina warned defendant that Fleming had obtained an actual revolver, which in turn relates to defendant's subjective belief "in the need to defend himself against imminent peril to life or great bodily injury." (*People v. Viramontes* (2001) 93 Cal.App.4th 1256, 1262 (*Viramontes*); (*People v. Minifie* (1996) 13 Cal.4th 1055, 1065.[1] [" 'A person claiming self-defense is required to

---

[1] "Lawful self-defense requires (1) that defendant reasonably believed he was in imminent danger; (2) that the immediate use of defensive force was necessary to defend against that danger; and (3) that defendant used no more force than necessary to defend against the danger." (*People v. Dryden* (2021) 60 Cal.App.5th 1007, 1025.) (Italics omitted.) "Self-defense is perfect or imperfect. For perfect self-defense, one must actually and reasonably believe in the necessity of defending oneself from imminent

"prove his own frame of mind," and in so doing is "entitled to corroborate his testimony that he was in fear for his life by proving the reasonableness of such fear." ' "])  The proffered evidence is relevant only if it reasonably supports an inference that, as defendant claims, Salina warned him Fleming could be armed with an actual gun.

Here, defendant did not claim to know about Fleming's BB gun or claim to have seen a gun or any weapon before he shot Fleming.  He testified that after Salina's warning, he believed Fleming had recently obtained an actual revolver and that the "object" Fleming was taking from his backpack was that gun.  Salina described the BB gun as looking like a "water pistol" and that the previous year (that is, at least nine months before the September shooting), she saw the BB gun in a crate at Fleming's former campsite but that Fleming did not carry the BB gun on his person or in his backpack.  Several witnesses testified Fleming's hands were empty when he was shot.  No weapon was found on or around Fleming.

Given defendant's own ignorance of the BB gun, and the absence of any evidence connecting the BB gun with the shooting, we are not persuaded by defendant's theory that he or Salina might have mistaken the BB gun for an actual revolver and that the question should have been a credibility determination for the jury.  There was no evidence suggesting such a mistake.  Defendant testified unequivocally that Salina had warned him about an actual revolver that Fleming had recently obtained, and he feared Fleming was pulling that gun from his backpack.  Salina, however, was emphatic in her police interview that Fleming's BB gun did not appear to be an actual firearm, but rather looked like a "water pistol" one could buy at a sporting goods store.  She was equally

---

danger of death or great bodily injury.  A killing committed in perfect self-defense is neither murder nor manslaughter; it is justifiable homicide." (*People v. Randle* (2005) 35 Cal.4th 987, 994.)  (Italics omitted.)  Although a person acting in imperfect self-defense "also actually believes he must defend himself from imminent danger of death or great bodily injury," that belief is unreasonable. (*Ibid*.)  "Imperfect self-defense mitigates, rather than justifies, homicide; it does so by negating the element of malice." (*Ibid*.; *see People v. Simon* (2016) 1 Cal.5th 98, 132 (*Simon*).)

emphatic and consistent in both her police interview and her trial testimony that she had never seen Fleming with an actual gun and that she had never warned defendant about any kind of gun.

Defendant also proposes that after he shot Fleming and fled the scene, someone could have found and taken Fleming's BB gun. In support of that theory, defendant cites the surveillance video showing a person (presumably Derrick) approaching Fleming's body, bending over and then returning to his vehicle. He also notes that Fleming's skateboard and the blanket Fleming and Salina used were later recovered from Derrick's truck. But one cannot logically infer both the presence and removal of a hypothetical weapon—which no one claimed to have seen—from evidence that two entirely different items observed at the scene were taken and recovered.

Both hypotheses are speculative and unsupported by evidence. The trial court did not abuse its discretion in ruling that the proffered evidence does not meet the definition of "relevant evidence" in Evidence Code section 210. (*Louie*, *supra*, 158 Cal.App.3d Supp. at p. 47; *Williams, supra*, 23 Cal.App.5th at p. 416.)

We also reject defendant's analogy to cases admitting evidence of a defendant's possession of a weapon possibly related to the crime charged, even though the actual weapon used was never found. Defendant cites *People v. Sanchez* (2019) 7 Cal.5th 14; *People v. Cox* (2003) 30 Cal.4th 916; and *People v. Neely* (1993) 6 Cal.4th 877. In each of those cases, the weapon was sufficiently connected to the crime so that the fact finder could logically and reasonably infer that the defendant used it to commit the crime. In *Cox*, for example, it could not be determined how the victims were killed, but because one victim had said " 'she would be right back' " before her disappearance, and a second victim had expressed her fear of defendant, it was "reasonable to infer that defendant, who had unfettered access to three weapons [found in the search of defendant's car], may have used" the guns to force his victims into his car and remain there while he drove them to the location of their murders. (*Cox*, at p. 956.) Likewise in *Sanchez*, testimony

10

that the defendant possessed a nine-millimeter handgun at the time of the murders was relevant and admissible because it "could easily have been the one used in the murders" in which the victims had been shot by a nine-millimeter semiautomatic handgun. (*Sanchez*, at p. 27.) And in *Neely*, the rifle and ammunition found inside the truck the defendant had driven to the crime scene was admissible because "there was no direct evidence as to the fatal shooting that would render this evidence irrelevant to establish facts material to proof of the charged offenses." (*Neely*, at 896.)

In contrast here, there is no evidence that defendant knew about Fleming's BB gun, or that Fleming had the BB gun with him when defendant shot him, or that Salina might have mistaken the BB gun for an actual revolver when she purportedly told defendant about Fleming acquiring a revolver.

### 3. No Constitutional Violation Or Miscarriage of Justice

Defendant argues that the trial court's exclusion of the proffered evidence violated his federal constitutional right to present a complete defense and to due process. However, "because defendant's evidence failed to meet the threshold requirement of relevance, its exclusion … did not implicate any due process concerns." (*Babbitt, supra*, 45 Cal.3d at p. 685; see also *People v. Riggs* (2008) 44 Cal.4th 248, 292; *People v. Marks* (2003) 31 Cal.4th 197, 226–227 (*Marks*); *People v. Fudge* (1994) 7 Cal.4th 1075, 1102–1103 [An application of the ordinary rules of evidence generally does not infringe on a defendant's right to present a defense.].)

The erroneous admission or exclusion of evidence does not require reversal except where the error caused a miscarriage of justice. (Evid. Code, §§ 353, subd. (b), 354.) Even assuming the trial court's decision to exclude the proffered evidence constituted an abuse of discretion, defendant fails to demonstrate how the exclusion was prejudicial. Given that "the application of ordinary rules of evidence … does not implicate the federal Constitution," prejudice is assessed under the standard of *People v. Watson* (1956) 46 Cal.2d 818, 838. (*Marks*, *supra*, 31 Cal.4th at p. 227.) Applying that standard, we see

11

no reasonable probability of a more favorable outcome for defendant if the proffered evidence had been admitted.

It is undisputed that defendant was the shooter. The evidence of defendant's culpability for murder—including his own testimony—was very strong, while evidence of a need to act in self-defense was weak. After purportedly learning Fleming might have acquired a revolver, defendant testified he illegally obtained a rifle and concealed it in his car. On the day of the shooting, he arrived to pick up Salina with the rifle loaded and readily accessible in the back seat. Defendant testified he felt threatened by comments Fleming made when he declined defendant's offer of a ride. Defendant testified he then saw Fleming reach into his backpack, but defendant did not claim to see a gun or anything resembling a gun. In response to a conditional threat, and without ever seeing a gun, defendant shot Fleming in the chest. Without apparent concern for Fleming or making a claim of self-defense at the time, defendant immediately fled, disposed of the rifle in a creek and drove to another girlfriend's house. When questioned by police, defendant lied about shooting Fleming and only claimed self-defense after being informed about the existence of surveillance video.

Significant evidence contradicted a self-defense theory, including the lack of corroboration Fleming had actually threatened defendant, and the fact that defendant shot Fleming before seeing or claiming to see a weapon. There was no evidence that Fleming was carrying a gun at the time. (See *People v. Wright* (1985) 39 Cal.3d 576, 585–586 [error in excluding evidence that victim had heroin in his system was harmless where significant evidence belied a self-defense claim, including the defendant's admission he shot the victim without hesitation; witnesses contradicted the defendant's assertion that the victim threatened him; and no weapon was found on or near the victim's body].) In addition, the jury here heard evidence that defendant claimed self-defense in previous prosecutions for burglary and assault with a deadly weapon. Testimony that Fleming at

12

some point possessed a BB gun that may have resembled a revolver is unlikely to have affected the outcome at trial in light of the foregoing.

## B. NO ERROR IN REFUSING TO INSTRUCT ON HEAT OF PASSION

Defendant contends the trial court was incorrect to deny his request for an instruction on voluntary manslaughter based on heat of passion. Defendant argues the trial court's refusal to give that instruction was clear error as his theory was supported by substantial evidence: namely, his own testimony that he was angry and scared and believed Fleming meant to kill him after Fleming threatened him. The Attorney General responds that defendant's testimony is not substantial evidence of either objectively or subjectively adequate provocation to support an instruction on heat of passion.

We review de novo whether the trial court improperly failed to instruct on a lesser included offense (*People v. Souza* (2012) 54 Cal.4th 90, 113). In assessing the sufficiency of the evidence to support an instruction, we view the evidence in the light most favorable to the defendant. (*People v. Millbrook* (2014) 222 Cal.App.4th 1122, 1137.) Based on our independent review, we conclude there was insufficient evidence of either subjectively or objectively provocative conduct to instruct the jury on heat of passion.

" 'An instruction on a lesser included offense must be given only if there is substantial evidence from which a jury could reasonably conclude that the defendant committed the lesser, uncharged offense but not the greater, charged offense.' " (*People v. Nelson* (2016) 1 Cal.5th 513, 538.) Evidence is substantial if a reasonable jury could find the existence of the particular facts underlying the instruction. "In determining whether the evidence is sufficient to warrant a jury instruction, the trial court does not determine the credibility of the defense evidence, but only whether 'there was evidence which, if believed by the jury, was sufficient to raise a reasonable doubt.' " (*People v. Salas* (2006) 37 Cal.4th 967, 982–983.) Evidence that is minimal, insubstantial, or would

13

require the jury to make speculative inferences about the case is insufficient to require an instruction on a lesser included offense.  (See *Simon*, *supra*, 1 Cal.5th at p. 132.)

Murder is an unlawful killing with malice aforethought (§ 187, subd. (a)), while manslaughter is an unlawful killing without malice (§ 192, subd. (a)).  "Manslaughter is a lesser included offense of murder, and a defendant who commits an intentional and unlawful killing but who lacks malice is guilty of voluntary manslaughter.  Heat of passion is one of the mental states that precludes the formation of malice and reduces an unlawful killing from murder to manslaughter."  (*Nelson*, *supra*, 1 Cal.5th at p. 538); see *People v. Breverman* (1998) 19 Cal.4th 142, 154.  Heat of passion is "caused by legally sufficient provocation that causes a person to act, not out of rational thought but out of unconsidered reaction to the provocation."  (*People v. Beltran* (2013) 56 Cal.4th 935, 942 (*Beltran*).)

A heat of passion theory of voluntary manslaughter has objective and subjective components.  (*People v. Moye* (2009) 47 Cal.4th 537, 549 (*Moye*).)  Under both elements, provocation may occur over a period of time (*People v. Wharton* (1991) 53 Cal.3d 522, 571–572) and may be anything that arouses intense fear, anger, or jealousy.  (*People v. Fenenbock* (1996) 46 Cal.App.4th 1688, 1704.)  To prove the subjective element, the defendant "must be shown to have killed while under 'the actual influence of a strong passion' induced by such provocation."  (*Moye*, at p. 550; see *Nelson*, *supra*, 1 Cal.5th at p. 539.)  Defendant contends the subjective prong is satisfied by his testimony that Fleming's threat, coupled with defendant's belief that Fleming had acquired a gun, made him fearful.  But viewed in the context of his entire testimony regarding the shooting, we conclude no reasonable juror could conclude defendant acted "rashly or without due deliberation and reflection, and from this passion rather than from judgment."  (*Moye*, at p. 553.)

In *Moye*, the defendant's testimony that he was not in a " 'right state of mind' " when the victim attacked him with a baseball bat was deemed insufficient to justify

14

instructions on heat of passion voluntary manslaughter.  There the only testimonial evidence on whether defendant " 'actually, subjectively, kill[ed] under the heat of passion' " was defendant's "blow-by-blow recounting of events in which he characterized every swing he took with the bat as a defensive response to each of [the victim's] successive advances." (*Moye*, *supra*, 47 Cal.4th at p. 554.)  Similarly here, although defendant stated that he feared for his life, the thrust of his testimony was that he consciously acted in response to Fleming's words and movements by getting out of his car, retrieving the rifle from the back seat, and firing one shot at Fleming's chest.

Nor does the record satisfy the objective element with evidence that a reasonable person could feel provoked to respond as defendant did under these circumstances. "Objectively, the victim's conduct must have been sufficiently provocative to cause an ordinary person of average disposition to act rashly or without due deliberation and reflection" under the given facts.  (*People v. Enraca* (2012) 53 Cal.4th 735, 759.) Defendant contends his statement to police that he just "reacted" out of fear when Fleming reached into his backpack is sufficient evidence to meet the objective element. But defendant may not " 'set up his own standard of conduct and justify or excuse himself' " by merely asserting that his own passions were aroused.  (*Beltran*, *supra*, 56 Cal.4th at p. 950.)  No reasonable jury could find that Fleming's conditional threat and reaching into a backpack, without an overtly aggressive action toward defendant or actually drawing a weapon, would cause a person of average disposition to react by retrieving a gun and shooting as a result of passion and not from judgment.

We have explained that in our view defendant did not offer substantial evidence of objective or subjective provocation to warrant a voluntary manslaughter instruction based on heat of passion.  Given that conclusion, we find no error and therefore need not consider the test for determining prejudice (discussed in *People v. Schuller* (2023) 15 Cal.5th 237, 260, fn. 7 [applying the *Chapman* standard to instructional error "when the record contains substantial evidence of heat of passion"]).

15

**C. NO CUMULATIVE PREJUDICE**

Defendant argues the cumulative effect of the alleged errors deprived him of his federal constitutional rights to due process and a fair trial. But as we have found no trial court error, there could be no cumulative prejudice.

## III. DISPOSITION

The judgment is affirmed.

_____

Grover, Acting P. J.

**WE CONCUR:**

_____

Lie, J.

_____

Wilson, J.

**H051174**
***The People v. Styre***